MASTER FILE NO. 2022-36264


IN RE: HURRICANE        *      IN THE DISTRICT COURT
ZETA LITIGATION         *
                        *
MDL NO. 22-0300         *      113TH JUDICIAL DISTRICT
                        *
                        *
                        *      HARRIS COUNTY, TEXAS
* * * * * * * * * * * * * * * * * * * * * * * * * * * *

          The deposition of PATRICK J. HAYES, M.D.,

     taken in connection with the captioned cause,

     pursuant to the following stipulations before

     CONNIE M. MARKS, Certified Court Reporter, at the

     offices of Elite Medical Wellness, 2802 Hodges

     Street, Lake Charles, Louisiana, on the 16th day

     November, 2023, beginning at 10:08 a.m.

Exhibit

5

```
 1         them fill out the IME consent at that time?
 2    A    Not anymore.  I used to take insurance at this --
 3         this facility, and there were issues -- really
 4         came from the custody evaluation channel.  People
 5         were being referred judicially for custody
 6         evaluations, and they wanted to use Medicaid or,
 7         for example, Blue Cross to pay for the custody
 8         eval, but those weren't -- there was no CPT code
 9         in the contract to cover that.  So at the time I
10         was taking insurance, I wanted to define for
11         people what we could do, what we weren't going to
12         do, where we would bill services where it would
13         be directly paid.  So that particular consent
14         you're talking about was during that season when
15         I took Medicaid, Medicare, Workers' Comp, all of
16         the other insurances.  Since August, I believe, 4
17         of 2019, I'm strictly fee for service across the
18         board.
19    Q    So you don't -- you don't bill to any third-party
20         payors at all, no Medicare, Medicaid, private
21         insurance, nothing?
22    A    Not insurances.  So if a case manager works with
23         me, like the individuals I've worked with on Mr.
24         Pleasant's case that we're going to come to,
25         would be those individuals we will bill; we have
```

```
 1        opposite.
 2   Q    Okay.  I see they've brought in a little bit
 3        easier to read copy here, so I'm going to take a
 4        look at that if you don't mind.
 5   A    Absolutely.
 6   Q    I see on there that you have testified in cases
 7        involving Arnold & Itkin on many occasions; is
 8        that true?
 9   A    I have testified on their behalf or at their
10        request before.
11   Q    Do you recall how many times?
12   A    I don't, no, ma'am.
13   Q    Do you recall how far back the relationship with
14        Arnold & Itkin goes?
15             MR. BOATRIGHT:
16                  Form.
17   A    I don't really have a relationship with Arnold &
18        Itkin.  I believe I'm one of the psychiatrists
19        and addiction med docs and cognitive med docs
20        that they trusted to treat individuals.  But my
21        particular relationship in this case is -- since
22        we're talking about this is with Access
23        Healthcare Management.  And the way I understand
24        that to work, they're a clinical case manager.
25        So I think they have a relationship with Arnold &
```

```
 1         Itkin.  And then if there's a case that Access
 2         needs to send to a psychiatrist or an addictions
 3         or a cognitive doc, Access sends them to me.
 4  MS. YOUNG:
 5  Q    Do you agree you testified on behalf of Arnold &
 6       Itkin clients more often than any other law firm?
 7  A    If -- if that's what the document suggests, I
 8       mean, I wouldn't dispute that.
 9  Q    Okay.
10           MS. YOUNG:
11               And this is part of Exhibit 1.  I'm
12           just going to substitute the larger copy.
13  MS. YOUNG:
14  Q    Do you have any billing agreements with Access
15       that changes the way you bill for the patients
16       being sent by that group?
17  A    Can you ask me that one again?  I didn't
18       understand.
19  Q    Yeah.  What's the name of the group that you said
20       has the relationship with Arnold & Itkin that is
21       sending the clients?
22           MR. BOATRIGHT:
23               Objection to form of the question.
24  A    Yeah, so it's my understanding that's Access
25       Healthcare Management.
```

```
 1              You want that as "Exhibit 5"?
 2         MR. MOUTON:
 3              Yes, please.  We'll mark this as
 4         "Exhibit 5."
 5  MR. MOUTON:
 6  Q    And, Doctor, just so that I'm clear on the
 7       billing and how this works, when a -- we're going
 8       to talk just about civil litigation referrals.
 9       Civil litigation referral that comes through
10       Access Healthcare to your office, your office
11       will bill -- Elite Medical Wellness will bill or
12       send their bills to Access Healthcare?
13  A    Yes, sir, that's correct.
14  Q    And then Access Healthcare will pay your office
15       directly?
16  A    That's correct, yes, sir.
17  Q    And that's using a fee schedule that's no
18       different from your private clinical practice fee
19       schedule, as I understand it?
20  A    Correct.  It's the straight fee schedule.  Now,
21       we have a contracted rate for their case
22       management, which is a percentage of the fees,
23       consistent with any of the case managers that
24       I've worked with over the years, but that's going
25       to be defined in the contract.
```

```
 1        opposite.
 2   Q    Okay.  I see they've brought in a little bit
 3        easier to read copy here, so I'm going to take a
 4        look at that if you don't mind.
 5   A    Absolutely.
 6   Q    I see on there that you have testified in cases
 7        involving Arnold & Itkin on many occasions; is
 8        that true?
 9   A    I have testified on their behalf or at their
10        request before.
11   Q    Do you recall how many times?
12   A    I don't, no, ma'am.
13   Q    Do you recall how far back the relationship with
14        Arnold & Itkin goes?
15             MR. BOATRIGHT:
16                  Form.
17   A    I don't really have a relationship with Arnold &
18        Itkin.  I believe I'm one of the psychiatrists
19        and addiction med docs and cognitive med docs
20        that they trusted to treat individuals.  But my
21        particular relationship in this case is -- since
22        we're talking about this is with Access
23        Healthcare Management.  And the way I understand
24        that to work, they're a clinical case manager.
25        So I think they have a relationship with Arnold &
```

```
 1        Itkin.  And then if there's a case that Access
 2        needs to send to a psychiatrist or an addictions
 3        or a cognitive doc, Access sends them to me.
 4   MS. YOUNG:
 5   Q    Do you agree you testified on behalf of Arnold &
 6        Itkin clients more often than any other law firm?
 7   A    If -- if that's what the document suggests, I
 8        mean, I wouldn't dispute that.
 9   Q    Okay.
10             MS.  YOUNG:
11                  And this is part of Exhibit 1.  I'm
12             just going to substitute the larger copy.
13   MS. YOUNG:
14   Q    Do you have any billing agreements with Access
15        that changes the way you bill for the patients
16        being sent by that group?
17   A    Can you ask me that one again?  I didn't
18        understand.
19   Q    Yeah.  What's the name of the group that you said
20        has the relationship with Arnold & Itkin that is
21        sending the clients?
22             MR. BOATRIGHT:
23                  Objection to form of the question.
24   A    Yeah, so it's my understanding that's Access
25        Healthcare Management.
```

|  |  |  |
|---|---|---|
| 1 |  | opposite. |
| 2 | Q | Okay.  I see they've brought in a little bit |
| 3 |  | easier to read copy here, so I'm going to take a |
| 4 |  | look at that if you don't mind. |
| 5 | A | Absolutely. |
| 6 | Q | I see on there that you have testified in cases |
| 7 |  | involving Arnold & Itkin on many occasions; is |
| 8 |  | that true? |
| 9 | A | I have testified on their behalf or at their |
| 10 |  | request before. |
| 11 | Q | Do you recall how many times? |
| 12 | A | I don't, no, ma'am. |
| 13 | Q | Do you recall how far back the relationship with |
| 14 |  | Arnold & Itkin goes? |
| 15 |  | MR. BOATRIGHT: |
| 16 |  | Form. |
| 17 | A | I don't really have a relationship with Arnold & |
| 18 |  | Itkin.  I believe I'm one of the psychiatrists |
| 19 |  | and addiction med docs and cognitive med docs |
| 20 |  | that they trusted to treat individuals.  But my |
| 21 |  | particular relationship in this case is -- since |
| 22 |  | we're talking about this is with Access |
| 23 |  | Healthcare Management.  And the way I understand |
| 24 |  | that to work, they're a clinical case manager. |
| 25 |  | So I think they have a relationship with Arnold & |

```
 1        Itkin.  And then if there's a case that Access
 2        needs to send to a psychiatrist or an addictions
 3        or a cognitive doc, Access sends them to me.
 4   MS. YOUNG:
 5   Q    Do you agree you testified on behalf of Arnold &
 6        Itkin clients more often than any other law firm?
 7   A    If -- if that's what the document suggests, I
 8        mean, I wouldn't dispute that.
 9   Q    Okay.
10             MS. YOUNG:
11                  And this is part of Exhibit 1.  I'm
12             just going to substitute the larger copy.
13   MS. YOUNG:
14   Q    Do you have any billing agreements with Access
15        that changes the way you bill for the patients
16        being sent by that group?
17   A    Can you ask me that one again?  I didn't
18        understand.
19   Q    Yeah.  What's the name of the group that you said
20        has the relationship with Arnold & Itkin that is
21        sending the clients?
22             MR. BOATRIGHT:
23                  Objection to form of the question.
24   A    Yeah, so it's my understanding that's Access
25        Healthcare Management.
```

```
 1        opposite.
 2   Q    Okay.  I see they've brought in a little bit
 3        easier to read copy here, so I'm going to take a
 4        look at that if you don't mind.
 5   A    Absolutely.
 6   Q    I see on there that you have testified in cases
 7        involving Arnold & Itkin on many occasions; is
 8        that true?
 9   A    I have testified on their behalf or at their
10        request before.
11   Q    Do you recall how many times?
12   A    I don't, no, ma'am.
13   Q    Do you recall how far back the relationship with
14        Arnold & Itkin goes?
15            MR. BOATRIGHT:
16                Form.
17   A    I don't really have a relationship with Arnold &
18        Itkin.  I believe I'm one of the psychiatrists
19        and addiction med docs and cognitive med docs
20        that they trusted to treat individuals.  But my
21        particular relationship in this case is -- since
22        we're talking about this is with Access
23        Healthcare Management.  And the way I understand
24        that to work, they're a clinical case manager.
25        So I think they have a relationship with Arnold &
```

```
1          Itkin.  And then if there's a case that Access
2          needs to send to a psychiatrist or an addictions
3          or a cognitive doc, Access sends them to me.
4     MS. YOUNG:
5     Q    Do you agree you testified on behalf of Arnold &
6          Itkin clients more often than any other law firm?
7     A    If -- if that's what the document suggests, I
8          mean, I wouldn't dispute that.
9     Q    Okay.
10              MS. YOUNG:
11                  And this is part of Exhibit 1.  I'm
12              just going to substitute the larger copy.
13    MS. YOUNG:
14    Q    Do you have any billing agreements with Access
15         that changes the way you bill for the patients
16         being sent by that group?
17    A    Can you ask me that one again?  I didn't
18         understand.
19    Q    Yeah.  What's the name of the group that you said
20         has the relationship with Arnold & Itkin that is
21         sending the clients?
22              MR. BOATRIGHT:
23                  Objection to form of the question.
24    A    Yeah, so it's my understanding that's Access
25         Healthcare Management.
```

```
 1  MS. YOUNG:
 2  Q    Do you have any special billing arrangements with
 3       Access Healthcare on how their patients should be
 4       billed that's different from the rest of your
 5       client base here?
 6  A    No, ma'am.  It's a straight fee schedule.
 7  Q    And is it billed at the time of service?
 8  A    With that group, we bill monthly.  So it's the
 9       same month that the service was delivered, but it
10       may not be the day that the service was done.
11  Q    To your knowledge, what is Access Healthcare?
12       What is that group?
13  A    It's a clinical case --
14            MR. BOATRIGHT:
15                 Form.
16  A    -- case management group.  They -- for example,
17       on the case that we're here to discuss today,
18       they have referred this individual to me.  They
19       have, at some point, communicated with my
20       administrative staff on what is requested.  So
21       there can be different things requested from
22       Access.  They may request treatment and no
23       report.  It may be a defense IME.  It may be a
24       spinal fusion clearance.  It may be a gastric
25       bypass clearance.  It may be a spinal stimulator
```

```
 1          recorded.  So just -- all of this stuff that goes
 2          into this, we want to be as aboveboard as
 3          possible.  So it's really just a consent to
 4          treatment.  There's also a line in there that's a
 5          consent that there is a no-show fee if they miss
 6          their visit.
 7  MR. MOUTON:
 8  Q    Okay.  So let me ask the question specifically
 9       related to referrals from Access Healthcare.  For
10       those type of referrals, is there a form similar
11       to what you just described that the patient would
12       complete in your office?
13  A    No, sir.  They're now all exactly the same.  So
14       if you saw my sign on the street and walked in
15       and wanted your sleep med management, versus if
16       you got referred from Access, versus if a judge
17       referred you down from Marksville for a clinical
18       case, it's all the same document.
19  Q    Okay.  The -- how many referrals do you get from
20       Access Healthcare now, say, on an average a
21       month?
22  A    I really don't know.  I'm not involved in that
23       level of management.  I know this particular
24       service line, one of the charts that I do track
25       that's produced by my practice manager, one of
```

60

| | | |
|---|---|---|
| 1 | | the numbers I track is that we do about 875 |
| 2 | | visits per month across the board of all types. |
| 3 | Q | Okay.  Do you own any part of Access Healthcare? |
| 4 | A | No, sir. |
| 5 | Q | Do you own Elite Medical Wellness? |
| 6 | A | Yes, sir.  It's a single management -- or a |
| 7 | | single owner LLC. |
| 8 | Q | Okay. |
| 9 | A | You may see some older stuff.  It was |
| 10 | | incorporated as a partnership, but in 2013, I |
| 11 | | believe that was, and I think in 2014, we |
| 12 | | dissolved that and I became the sole owner. |
| 13 | Q | Do you know who the owners of Access Healthcare |
| 14 | | are? |
| 15 | A | I believe -- |
| 16 | | MR. BOATRIGHT: |
| 17 | | Objection.  Form. |
| 18 | A | I believe it's John Condos.  I know he's the -- |
| 19 | | the manager of it.  I really don't know what |
| 20 | | their internal business structure is, though. |
| 21 | MR. MOUTON: | |
| 22 | Q | Is he in Lake Charles? |
| 23 | A | Sir? |
| 24 | Q | Does John live in Lake Charles? |
| 25 | A | I think so, yeah.  John, I know he -- he likes to |

```
 1          Itkin.  And then if there's a case that Access
 2          needs to send to a psychiatrist or an addictions
 3          or a cognitive doc, Access sends them to me.
 4   MS. YOUNG:
 5   Q    Do you agree you testified on behalf of Arnold &
 6        Itkin clients more often than any other law firm?
 7   A    If -- if that's what the document suggests, I
 8        mean, I wouldn't dispute that.
 9   Q    Okay.
10              MS. YOUNG:
11                  And this is part of Exhibit 1.  I'm
12              just going to substitute the larger copy.
13   MS. YOUNG:
14   Q    Do you have any billing agreements with Access
15        that changes the way you bill for the patients
16        being sent by that group?
17   A    Can you ask me that one again?  I didn't
18        understand.
19   Q    Yeah.  What's the name of the group that you said
20        has the relationship with Arnold & Itkin that is
21        sending the clients?
22              MR. BOATRIGHT:
23                  Objection to form of the question.
24   A    Yeah, so it's my understanding that's Access
25        Healthcare Management.
```

```
 1              But the IME component is a report.  It is an
 2         ongoing digitized status updates.  It's a
 3         willingness, it's the capability to sit down and
 4         do an action like we are today versus, you know,
 5         at my state clinic where we really don't do any
 6         forms at all, we don't do disability, we don't do
 7         teachers' retirement stuff.  We really fight
 8         aggressively to keep my providers from doing
 9         anything like that because it's just clinicals.
10    MS. YOUNG:
11    Q    Do you know what percentage of the patients at
12         least are referred to you by attorneys?
13    A    Yeah, I have a basic sense.  Now, do you want me
14         to include -- well, I'll split it out with IMEs
15         as well.  So there's about 2200 patients here.
16         About one-third of them are treatment as usual,
17         off the street.  So these are people that have
18         found us somehow.  They must like the services
19         they're getting because they pay at the time of
20         their service and then they come back.  Some of
21         them have brought other people in.  So that's
22         about 700 and change of the cases here.
23              Of the other two-thirds, probably 15 percent
24         of those are strict IMEs.  We put those in the
25         blue charts.  That's where an individual is being
```

```
 1        consented simply for an administrative action.
 2        If I do a defense IME, I'm just going to tell the
 3        person, "I'm working for the attorney that is on
 4        the other side of your case.  They've asked me to
 5        talk to you.  This isn't treatment."  I did a
 6        criminal competency yesterday, and I told the
 7        individual, "I'm not going to offer you advice,
 8        medications, or any style of treatment or
 9        services."
10             So I'd say about 15 percent by count.  But
11        one of them I recently did was a constitutional
12        rights case.  I think I received 29,000 pages of
13        records on that.  So it's one of those -- yeah,
14        it's one on the forensic CV, but it's going to
15        take --
16    Q   A long, long time.
17    A   -- 80 hours or something --
18    Q   Okay.
19    A   -- or however hours.  And then of the cases that
20        are clinical as well, so that's another -- we've
21        got about 50 percent of the caseload.  I would
22        say about -- by count, 75, 80 percent of those
23        are plaintiff side; the rest of them would be
24        defense side.
25             But, again, those can vary -- that can vary
```

|    |   |                                                              |
|----|---|--------------------------------------------------------------|
| 1  |   | by week.  That can vary by time.  And then I                 |
| 2  |   | could be off by a  -- I don't really sit around              |
| 3  |   | and count that.                                              |
| 4  | Q | I know.  But 70 to 85 percent is of what number?             |
| 5  |   | Seventy to 85 percent of the 2200?                           |
| 6  | A | No, ma'am.  So of the two-thirds that are not                |
| 7  |   | simply coming in for anxiety management,                     |
| 8  |   | depression management, PTSD management.                      |
| 9  | Q | Okay.  Do you know how many times -- now, let me             |
| 10 |   | break this out.  Let's take the criminal out, and            |
| 11 |   | let's stick with just the civil side now.  Okay?             |
| 12 |   | So we're on the other spreadsheet.  Do you know              |
| 13 |   | how many times a year you testified in civil                 |
| 14 |   | cases as is reflected on your -- your spreadsheet            |
| 15 |   | that you just showed us?                                     |
| 16 | A | That varies as well.  During -- excuse me --                 |
| 17 |   | 2020, 2021 with all the COVID stuff going on in              |
| 18 |   | courts, there weren't as many.  There was a                  |
| 19 |   | handful.  And then, of course, that compressed               |
| 20 |   | all of the court stuff.  So 2022, 2023, there                |
| 21 |   | seemed to have been a lot.  It'll be recorded on             |
| 22 |   | the -- on the CV.  So if it's gone before sworn              |
| 23 |   | testimony, it's going to be on that CV.                      |
| 24 |   | I would hazard to guess it's about once a                    |
| 25 |   | month on the civil side -- this is court.  Now,              |

```
 1        the numbers I track is that we do about 875

 2        visits per month across the board of all types.

 3   Q    Okay.  Do you own any part of Access Healthcare?

 4   A    No, sir.

 5   Q    Do you own Elite Medical Wellness?

 6   A    Yes, sir.  It's a single management -- or a

 7        single owner LLC.

 8   Q    Okay.

 9   A    You may see some older stuff.  It was

10        incorporated as a partnership, but in 2013, I

11        believe that was, and I think in 2014, we

12        dissolved that and I became the sole owner.

13   Q    Do you know who the owners of Access Healthcare

14        are?

15   A    I believe --

16             MR. BOATRIGHT:

17                  Objection.  Form.

18   A    I believe it's John Condos.  I know he's the --

19        the manager of it.  I really don't know what

20        their internal business structure is, though.

21   MR. MOUTON:

22   Q    Is he in Lake Charles?

23   A    Sir?

24   Q    Does John live in Lake Charles?

25   A    I think so, yeah.  John, I know he -- he likes to
```

```
 1          Itkin.  And then if there's a case that Access
 2          needs to send to a psychiatrist or an addictions
 3          or a cognitive doc, Access sends them to me.
 4   MS. YOUNG:
 5   Q    Do you agree you testified on behalf of Arnold &
 6        Itkin clients more often than any other law firm?
 7   A    If -- if that's what the document suggests, I
 8        mean, I wouldn't dispute that.
 9   Q    Okay.
10            MS. YOUNG:
11               And this is part of Exhibit 1.  I'm
12            just going to substitute the larger copy.
13   MS. YOUNG:
14   Q    Do you have any billing agreements with Access
15        that changes the way you bill for the patients
16        being sent by that group?
17   A    Can you ask me that one again?  I didn't
18        understand.
19   Q    Yeah.  What's the name of the group that you said
20        has the relationship with Arnold & Itkin that is
21        sending the clients?
22            MR. BOATRIGHT:
23               Objection to form of the question.
24   A    Yeah, so it's my understanding that's Access
25        Healthcare Management.
```

```
 1                    You want that as "Exhibit 5"?
 2            MR. MOUTON:
 3                    Yes, please.  We'll mark this as
 4            "Exhibit 5."
 5   MR. MOUTON:
 6   Q    And, Doctor, just so that I'm clear on the
 7        billing and how this works, when a -- we're going
 8        to talk just about civil litigation referrals.
 9        Civil litigation referral that comes through
10        Access Healthcare to your office, your office
11        will bill -- Elite Medical Wellness will bill or
12        send their bills to Access Healthcare?
13   A    Yes, sir, that's correct.
14   Q    And then Access Healthcare will pay your office
15        directly?
16   A    That's correct, yes, sir.
17   Q    And that's using a fee schedule that's no
18        different from your private clinical practice fee
19        schedule, as I understand it?
20   A    Correct.  It's the straight fee schedule.  Now,
21        we have a contracted rate for their case
22        management, which is a percentage of the fees,
23        consistent with any of the case managers that
24        I've worked with over the years, but that's going
25        to be defined in the contract.
```

```
 1                        CERTIFICATE

 2

 3        This certification is valid only for a transcript

 4   accompanied by my original signature and raised

 5   required seal on this certificate.

 6        I, CONNIE M. MARKS, Certified Court Reporter in

 7   and for the State of Louisiana, as the officer before

 8   whom this testimony was taken, do hereby certify that

 9   PATRICK J. HAYES, M.D., after having been duly sworn

10   by me upon authority of R.S. 37:2554, did testify on

11   the 16th day of November, 2023, at Lake Charles,

12   Louisiana, as hereinbefore set forth in the foregoing

13   66 pages; that this testimony was reported by me in

14   the voice writing reporting method, was prepared and

15   transcribed by me or under my personal direction and

16   supervision, and is true and correct to the best of my

17   ability and understanding; that the transcript has

18   been prepared in compliance with the transcript format

19   guidelines required by statute and rules of the board;

20   that I am informed about the complete arrangement,

21   financial or otherwise, with the person or entity

22   making arrangements for deposition services; that I

23   have acted in compliance with the prohibition on

24   contractual relationships, as defined by Louisiana

25   Code of Civil Procedure Article 1434 and rules of the
```

```
 1   board; that I have no actual knowledge of any
 2   prohibited employment or contractual relationship,
 3   direct or indirect, between a court reporting firm and
 4   any party litigant in this matter, nor is there any
 5   such relationship between myself and a party litigant
 6   in this matter; that I am not related to counsel or to
 7   any of the parties hereto, I am in no manner
 8   associated with counsel for any of the interested
 9   parties to this litigation, and I am in no way
10   concerned with the outcome thereof.
11        This 20th day of November, 2023, Lafayette,
12   Louisiana.
13
14
15   _____
16   Connie M. Marks
     Certified Court Reporter #29027
17
18
19
20
21
22
23
24
25
```