UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | | |
|---|---|---|
| IN RE: MOTION TO COMPEL COMPLIANCE WITH SUBPOENA DIRECTED TO ELITE MEDICAL WELLNESS, LLC | § § § § § § § § § § | MISC. ACTION NO. 2:25-mc-00015 |
| LANDON PERRY, | § § | CIVIL ACTION NO. 4:23-CV-04441 |
| *Plaintiff,* | § § | CURRENTLY PENDING IN THE |
| v. | § § | UNITED STATED DISTRICT COURT SOUTHERN DISTRICT OF TEXAS |
| HALLIBURTON ENERGY SERVICES, INC., | § § § | HOUSTON DIVISION |
| *Defendant.* | § § § § § | |

HALLIBURTON'S RESPONSE TO
ELITE MEDICAL WELLNESS, LLC'S
MOTION FOR PROTECTION

Movant-Defendant Halliburton Energy Services, Inc. ("Halliburton") respectfully submits

the following response to Elite Medical Wellness, LLC's ("Elite") Motion for Protection.

## TABLE OF CONTENTS

I. INTRODUCTION ....................................................................................................... 1

II. FACTUAL BACKGROUND ..................................................................................... 2

    A.   Medical funding arrangements create financial incentives for medical providers to give diagnoses and testimony favorable to plaintiffs and to inflate their charges. ............................ 2

    B.   Elite, Access, and A&I have a long-standing and ongoing financial relationship. ............. 3

        1.   Elite regularly treats personal injury plaintiffs represented by A&I and testifies favorably on their behalf. ....................................................................................................... 3

        2.   A&I refers plaintiffs to Access who refers them to Elite then purchases Elite's accounts receivable at contractually agreed amounts. ........................................................................... 4

    C.   Elite's providers have given diagnoses and testimony favorable to Plaintiff and are poised to do the same at trial. ....................................................................................................... 6

    D.   Elite's diagnoses and opinions permeate the entirety of Plaintiff's damages claims.......... 7

    E.   Plaintiff is trying to pass off Elite's providers, including Dr. Hayes, as neutral and disinterested "treating physicians." ............................................................................................. 8

    F.   Halliburton's corporate representative topics focus on the nature and scope of the relationship between Elite, Access, and A&I and on the bias of Elite's providers. ................... 8

III. ARGUMENT & AUTHORITIES ........................................................................ 9

    A.   The discovery Halliburton seeks is relevant to both the bias of Elite's testifying experts and the reasonable value of the services they provided. ............................................................ 9

    B.   Dr. Hayes was unable or unwilling to provide responsive information during his individual deposition. ................................................................................................................. 12

    C.   This Court has previously compelled documentary discovery from Elite relevant to issues similar to those that are present in this case. ............................................................................. 14

    D.   The Court should simply modify the subpoena's date for compliance........................... 16

IV. CONCLUSION AND PRAYER ............................................................................. 17

CERTIFICATE OF SERVICE .................................................................................... 19

## <u>CASES</u>

*Barnes v. Dolgencorp, LLC.*,
  No. CV 22-2179, 2023 WL 7403450, at *5 (E.D. La. Nov. 9, 2023) ........................................ 9

*Boutte v. Elite Medical Wellness, et al*, No. 2:24-mc-00011 ........................................................... 4

*Houston v. Publix Supermarkets, Inc.*,
  No. 1:13-CV-206, 2015 WL 4581541, at *1 (N.D. Ga. Jul. 29, 2015) ................................ 2, 10

*In re: American Medical Systems, Inc.*, ................................................................................................
  MDL No. 2325, 2016 WL 3077904, at * (S.D.W. Va. May 31, 2016)...................................... 9

*Louisiana Corral Mgmt., LLC v. Axis Surplus Ins. Co.*,
  650 F.Supp.3de 49, 499 (E.D. La. 2023).............................................................................. 14, 16

*McClain v. Sysco New Orleans, et al.*,
  No. 19-1801 C/W 19-3283, 2020 WL 11028497, at *10 (E.D. La. Jul. 17, 2020). ............ 3, 7, 9

*Michael Johnson, et al v. Packaging Corp. of America, et al.*,
  No. 3:18-613-SDD ........................................................................................................................ 4

*ML Healthcare Services, LLC v. Publix Super Markets, Inc.*,
  881 F.3d 1293, 1296 (11th Cir. 2018). ...................................................................................... 10

*Rangel v. Anderson*,
  No. 2:15-cv-81, 202 F.Supp.3d 1361, 1373 (S.D. Ga. Aug. 23, 2016) ................................ 2, 10

*Tarleton v. DG Louisiana LLC*,
  No. 6:20-CV-00294, 2022 WL 2347346, at *4–5 (W.D. La. June 29, 2022)............................. 9

*Thomas v. Chambers*,
  No. CV 18-4373, 2019 WL 8888169, at *3–4 (E. D. La. Apr. 26, 2019) ................................... 9

**Statutes:**

Fed. R. Civ. P. 45............................................................................................................................ 16

Fed. R. Evid. 401(a))........................................................................................................................11

Fed. R. Evid. 403 ............................................................................................................................ 12

## I.  INTRODUCTION

Plaintiff is represented in the underlying case by the law firm of Arnold & Itkin, LLP ("A&I").  The evidence in that case indicates that A&I referred Plaintiff to a medical funding company called Access Healthcare Management ("Access") with whom it has a longstanding financial relationship.  Similarly, Access referred Plaintiff to Elite with whom it has a longstanding financial relationship.  Elite provided medical services to Plaintiff at inflated rates then sold its accounts receivable to Access at highly discounted, contracted rates.  Elite issued favorable diagnoses for Plaintiff and is poised to give those same opinions at trial, where A&I will present the inflated rates Elite charged as a part of Plaintiff's damages claim.  A&I will then pay Access at some lower amount out of any settlement or judgment in the case.

Plaintiff has designated Elite's owner, Dr. Patrick Hayes, as a testifying expert.  Halliburton contends Dr. Hayes is a biased witness with a financial interest in a favorable resolution for Plaintiff in the underlying case, rather than the neutral and disinterested "treating physician" Plaintiff is attempting to portray him as.  Dr. Hayes has a financial motive to provide favorable diagnoses and testify favorably for Plaintiff to continue securing a steady stream of personal injury plaintiffs as patients from Access, and, by extension, from A&I.

During his individual deposition, Dr. Hayes claimed ignorance of the topics at issue in the corporate representative deposition he now seeks to prevent.  The information is relevant to Dr. Hayes' credibility, or lack thereof, and to the reasonable value of the medical services Elite rendered to Plaintiff.

## II. FACTUAL BACKGROUND

**A.      Medical funding arrangements create financial incentives for medical providers to give diagnoses and testimony favorable to plaintiffs and to inflate their charges.**

A medical funding company "serves as an investor in the lawsuit…" *Rangel v. Anderson*, 202 F.Supp.3d 1361, 1373 (S.D. Ga. 2016) (citing *Houston Publix Supermarkets, Inc.*, No. 1:13-CV-206,  2015 WL 4581541, at *2 (N.D. Ga. Jul. 29, 2015)).  While slight variations exist, the typical funding and factoring scheme works like this:



Personal injury firms refer plaintiffs to medical funding companies. Those companies then refer plaintiffs to selected doctors who provide treatment and sell their accounts receivable to the funding companies. The plaintiffs' lawyers then designate those doctors as non-retained testifying experts to try to pass them off as neutral and disinterested treating physicians. The doctors then testify favorably for the plaintiffs at deposition and at trial in the hope of securing additional plaintiffs from the funding companies. The plaintiffs, the lawyers, and the funding companies then get paid out of any settlement or judgment, and the cycle begins anew with the next case. Needless to say, this creates significant financial incentives for the doctors to provide diagnoses and testimony helpful to plaintiffs.  As one court has put it:

> The bigger plaintiffs' recovery in this matter, the more [the funding and factoring company] will collect on the outstanding receivable.  [The company] might be inclined to make future purchases from medical providers whose accounts receivable result in better recovery, and this might give the medical providers an incentive to give testimony that is favorable to a finding of liability and a bigger

damages award.  Further, the emails submitted by defendants indicate that [the company] may approve funding of additional medical treatment, which could similarly give medical providers a bias in favor of testimony that would support a bigger recovery for the plaintiffs.  If [the company] is confident it will ultimately be able to collect the amount funded from the plaintiff because she will prove liability at trial and obtain a big damages award, then [the company] might be more willing to approve funding.  The physician, who understandably hopes to be paid for work performed, might be inclined to testify favorably to a plaintiff on causation and damages so that [the company] will be more likely to approve funding of medical treatment in the future and/or purchase that doctor's receivables at a higher rate for the next plaintiff or the next time the contract is negotiated.  Certain that she has a guaranteed return on services performed by virtue of the funding agreement, the physician may be motivated to overtreat; at the very least, guaranteed that she will recover X% of the billings without having to defend them, the physician may be motivated to overbill.

*McClain v. Sysco New Orleans, et al.*, No. 19-1801 C/W 19-3283, 2020 WL 11028497, at \*10 (E.D. La. Jul. 17, 2020).

**B.    Elite, Access, and A&I have a long-standing and ongoing financial relationship.**

**1.    Elite regularly treats personal injury plaintiffs represented by A&I and testifies favorably on their behalf.**

A review of Dr. Hayes' testimony history shows he testified on behalf of plaintiffs represented by A&I approximately 50 times between 2016 and 2024. *See* Ex. 1, Testimony History. This is almost four times as many times as the next most frequent law firm. *Id*. Dr. Hayes does not dispute these numbers.  *See* Ex. 2, Hayes Dep. at 145:20-146:7; 150:14-21.

As one glaring example of how A&I and Elite/Dr. Hayes are joined at the hip, A&I represents 23 plaintiffs in multidistrict litigation currently pending in state district court in Harris County, Texas.  *See* Ex. 3, Transocean MDL Brief, at p. 2.  Of those 23 plaintiffs, A&I sent 21 of them—from all over the country—to see Dr. Hayes at his Elite clinic location in Lake Charles.[1] *Id*. at Attachment A ("Most Seen Medical Providers"); Attachment B ("Plaintiffs' Residences").

---

[1] Nineteen of those plaintiffs also saw Dr. Hayes' clinical staff at Elite.  *Id*. at Attachment A ("Most Seen Medical Providers").

Dr. Hayes likewise testified for an A&I plaintiff in April 2024 in the Middle District of Louisiana. *See Michael Johnson, et al v. Packaging Corp. of America, et al.*, No. 3:18-613-SDD, in the U.S. District Court for the Middle District of Louisiana.

And, in addition to the instant case, Defendant is aware of at least one other case pending in the Southern District of Texas in which Dr. Hayes has seen a plaintiff represented by A&I (there are likely more). *See Boutte, Jr. v. Jackson Offshore Operators, LLC et al*, No. 4:22-cv-00948, in the U.S. District Court for the Southern District of Texas. Elite and Dr. Hayes are attempting to resist discovery in that case, much as they are attempting to do in this case. *See Boutte v. Elite Medical Wellness, et al*, No. 2:24-mc-00011, in the U.S. District Court for the Western District of Louisiana; *Boutte v. Elite Medical Wellness, et al*, No. 4:25-cv-00138, in the U.S. District Court for the Southern District of Texas.

Defense counsel in the *Boutte* case identified 37 plaintiffs "involved in multiple lawsuits spanning six (6) different incidents or events," who are being treated by Elite and Dr. Hayes while simultaneously being represented by A&I. *See* Ex. 4, Movant's Supplemental Brief (Boutte Case).

**2. A&I refers plaintiffs to Access who refers them to Elite then purchases Elite's accounts receivable at contractually agreed amounts.**

Dr. Hayes testified regarding the nature of his relationship with Access:

> Q: What is Access Healthcare Management?
>
> A: They're a case management service that we work with who refers us patients that need behavioral health treatment.
>
> Q: Okay. And when you say case management company, what do you mean by that?
>
> A: … Access very much behaves like a private workers' comp where, if an individual has [a] behavioral health condition, they will find [a] behavioral health provider. We are one of those that Access works with. And then, when I need to place medication orders, when I need to schedule visits, those go through Access Healthcare Management for the scheduling. They will do all of that.

4

*See* Ex. 2, Hayes Dep. at 36:23-37:17.

> Q: Okay. And how long have you worked with Access Healthcare Management?
>
> A: Probably about 10 years at this point.
>
> Q: Okay. So they sent Mr. Perry to you in August of 2023, correct?
>
> A: That's correct.

*Id*. at 37:25-38:5.

When asked why he produced a report on Plaintiff (when purportedly acting as a treating physician rather than a retained expert for litigation), Dr. Hayes responded: "In this case, Access Healthcare Management requested that… So somebody at Access is working with somebody.  And Access told us that they wanted a full report with treatment on this guy, so that's what we provided." *Id*. at 46:10-18.

Dr. Hayes likewise gave deposition testimony in the multidistrict litigation refenced above where he described the relationship between A&I, Access, and Elite. *See* Ex. 5, Hayes MDL Dep. "My particular relationship in this case… is with Access Healthcare Management," Dr. Hayes noted.  *Id*. at 44:20-23.  "I think they have a relationship with Arnold & Itkin," he continued.  *Id*. at 44:25-45:1.  "And then if there's a case that Access needs to send to a psychiatrist or an addictions or a cognitive doc, Access sends them to me," he explained." *Id*. at 45:1-3.

When asked whether Access would pay his office directly, Dr. Hayes responded: "That's correct, yes, sir."  *Id*. at 57: 14-16. And, when asked about the method of compensation, Dr. Hayes testified that "we have a contracted rate for their case management, which is a percentage of the fees, consistent with any of the case managers that I've worked with over the years, but that's going to be defined in the contract."  *Id*. at 57:21-25.

The contract between Access and Elite, titled a "Lien and Receivables Purchase and Assignment Agreement," reflects that **Access has agreed to purchase Plaintiff's accounts receivable for fifty cents on the dollar for services involving clinical care**. *See* Ex. 6, Lien and Receivables Purchase and Assignment Agreement, Sec. 3.

Access referred Plaintiff to Elite on August 28, 2023.  *See* Ex. 7, Access Referral to Elite. Dr. Hayes testified to this fact during his deposition. *See* Ex. 2, Hayes Dep. at 25:21-22 ("…there's the triggering referral from Access Healthcare Management.").

Not coincidentally, Dr. Hayes has been working with Access for about the last 10 years, and Dr. Hayes has been testifying for plaintiffs represented by A&I for the past 9 or 10 years. *Id*. at 37:25-38-2; 147:6-20.  And, Access is involved in the multidistrict litigation in Harris County in exactly the same way in which it is involved here—sending A&I clients to Elite, purchasing Elite's accounts receivable, and waiting for a settlement or judgment to settle up with A&I.  *See* Ex. 3, Transocean MDL Brief, at p. 8-9.

**C.    Elite's providers have given diagnoses and testimony favorable to Plaintiff and are poised to do the same at trial.**

Not surprisingly, Elite and Dr. Hayes have issued diagnoses favorable to Plaintiff and Dr. Hayes has provided testimony favorable to Plaintiff at his deposition (and will do the same at trial). Dr. Hayes testified that Plaintiff's diagnoses include post-traumatic stress disorder, clinical insomnia, erectile dysfunction, and post-burn pain and itch related to burns of the genital area.  *See* Ex. 2, Hayes Dep. at 60:9-19.  With respect to the alleged erectile dysfunction, Dr. Hayes' diagnoses morphed over time from a diagnoses based on physical conditions to one based on both physical and psychiatric conditions, allegedly.  *Id*. at 61:4-62:11.

6

**D.      Elite's diagnoses and opinions permeate the entirety of Plaintiff's damages claims.**

Dr. Hayes will testify regarding the extent of Plaintiff's purported psychiatric injuries, causation (*i.e.*, that the accident at issue here caused those injuries), the necessity of past treatment, and the reasonableness of Elite's charges.  His testimony will also serve as the foundation for the opinions of Plaintiff's Life Care Planner on future medical needs and costs and Plaintiff's economist on lost past and future earning capacity.

Plaintiff has designated a retained Life Care Planner (Dr. Shelly Savant) and economic damages experts (Jeffrey Meyers and Harold Asher).  *See* Ex. 8, Plaintiff's Expert Designations. Dr. Savant relies heavily on Dr. Hayes' opinions regarding allegedly necessary future medical care for Plaintiff to arrive at the conclusion that Plaintiff will require between $570,813.12 and $599,563.12 in such care.  *See* Ex. 9, Plaintiff's Life Care Plan, at Summary Page; Pages 1-6 (repeatedly citing Dr. Hayes); Savant Memo re: Hayes Conferral and Summary of Opinions. Indeed, A&I coordinated with Elite to provide Dr. Savant with information she needed when developing her Life Care Plan.  *See* Ex. 10, A&I Email re Life Care Plan.

Likewise, Plaintiff's lost past and future earning capacity (and the amount of future maintenance payments to which he might be entitled) are likewise impacted by Dr. Hayes' opinion that Plaintiff is unable to reliably show up for work and complete a full workday.  *See* Ex. 2, Hayes Dep. at 85:22-86:1.  The longer Plaintiff is out of work as a result of the accident, after all, the higher the sum of maintenance payments to which he is presumably entitled.  If a jury were to conclude, for example, as a result of Dr. Hayes' testimony, that Plaintiff will never again be able to hold down a job, Plaintiff's lost future earning capacity damages would total $2,452,181.  *See* Ex. 11, Plaintiff's Economic Damages Report.

**E. Plaintiff is trying to pass off Elite's providers, including Dr. Hayes, as neutral and disinterested "treating physicians."**

Rather than designate Dr. Hayes and the other Elite providers as retained experts, Plaintiff has designated them as non-retained experts in an attempt to pass them off as neutral and disinterested "treating physicians." *See* Ex. 8, Plaintiff's Expert Designations. Designating them as such also has the added benefit, from Plaintiff's perspective, of complicating the obtaining of documentary discovery and depositions from Elite.

**F. Halliburton's corporate representative topics focus on the nature and scope of the relationship between Elite, Access, and A&I and on the bias of Elite's providers.**

Halliburton first served a subpoena, with deposition topics, on Elite on January 24, 2025. *See* Ex. 12, Return of Service. Halliburton again served a subpoena, with deposition topics, and notice of deposition on Elite on January 27, 2025. *See* Ex. 13, Subpoena and Notice of Deposition.

- Topics 1 through 3 related to the terms of any agreement, whether written or oral, relevant to Plaintiff's medical treatment or payment therefor.

- Topics 4 and 5 related to amounts charged by Elite for treatment rendered to Plaintiff and amounts actually paid to Elite for said treatment.

- Topic 6 asked for the identity and contact information of any person or entity that had agreed to pay for Plaintiff's treatment.

- Topics 7 and 8 sought the number of patients treated by Elite who were represented by A&I at the time of said treatment for the 4 years prior to Plaintiff's accident, and the amounts paid to Elite in relation to those patients.

- Topic 9 asked for the identity and contact information of any person or entity that made a payment responsive to Topic 8.

- Topic 10 sought the historical amounts Elite has accepted as payment for services rendered to A&I clients.

- Topic 11 sought the number of referrals to Elite and Dr. Hayes by Access and A&I during the 4 years prior to Plaintiff's accident.

- Topic 12 sought the amounts paid to Elite and Dr. Hayes by Access during the 4 years prior to Plaintiff's accident.

- Topic 13 related to communications relating to Plaintiff between Elite, Access, and A&I.

*Id*. at Ex. A.

### III. ARGUMENT & AUTHORITIES

**A.**    **The discovery Halliburton seeks is relevant to both the bias of Elite's testifying experts and the reasonable value of the services they provided.**

Courts in Louisiana and across the country have consistently held that evidence of medical funding arrangements, and the relationships between the plaintiffs' lawyers, funding companies, and doctors, is relevant and discoverable because it goes both to the bias of the plaintiff's testifying medical providers and the reasonableness of their charges—both of which are in dispute in this case. *See e.g.*, *Barnes v. Dolgencorp, LLC.*, No. CV 22-2179, 2023 WL 7403450, at *5 (E.D. La. Nov. 9, 2023) (finding records reflecting purchase of plaintiff's medical accounts receivable from his doctor by a factoring company relevant to the doctor's potential bias); *Tarleton v. DG Louisiana LLC*, No. 6:20-CV-00294, 2022 WL 2347346, at *4–5 (W.D. La. June 29, 2022) (holding medical factoring records "relevant to bias, credibility, and the reasonableness of Plaintiff's medical bills"); *McClain v. Sysco New Orleans*, No. CV 19-1801, 2020 WL 11028497, at *7–8, 10–11 (E.D. La. July 17, 2020) (finding that "accounts receivable by factoring companies are one of the most lucrative of the options" to cover "the cost of plaintiff's treatment"); *Thomas v. Chambers*, No. CV 18-4373, 2019 WL 8888169, at *3–4 (E. D. La. Apr. 26, 2019) (finding records relating to medical funding agreement relevant because "[t]he financial arrangement between plaintiffs' healthcare providers and the third-party funding companies could create an incentive for plaintiffs' treating physicians to want plaintiffs to win their case, because a victory could result in more referrals… [and] [t]hat incentive could lead a jury to question the treating physicians' testimony regarding causation"); *In re: American Medical Systems, Inc.*, MDL No. 2325, 2016 WL 3077904, at *5 (S.D.W. Va. May 31, 2016)  (finding document and deposition subpoenas to third-party factoring

companies sought relevant information relating to financial motive, credibility, and damages); *Houston v. Publix Supermarkets, Inc.*, No. 1:13-CV-206, 2015 WL 4581541, at *1 (N.D. Ga. Jul. 29, 2015) ("Testimony about [the medical factoring company's] relationship with [the plaintiff's] doctors is admissible for the purpose of attacking the credibility of their opinions"); *Rangel v. Anderson*, No. 2:15-cv-81, 202 F.Supp.3d 1361, 1373 (S.D. Ga. Aug. 23, 2016) ("the medical funding company's] involvement in Plaintiff's treatment is highly relevant to the issue of Plaintiff's treating physician's credibility and potential bias").

Perhaps the most direct and comprehensive treatment Halliburton has found comes from the United States Court of Appeals for the 11th Circuit, which examined the precise issue presented here and affirmed the same arguments Halliburton makes in this response. *See **ML Healthcare Services, LLC v. Publix Super Markets, Inc.**, 881 F.3d 1293, 1296 (11th Cir. 2018).*

During discovery, the defendants in that case learned that ML Healthcare Services would contract with doctors to provide medical care for personal injury plaintiffs with viable tort claims, refer plaintiffs to those doctors, purchase the accounts receivable from the doctors for that medical care, then seek payment for those accounts receivable from any settlement or judgment. *Id*. Furthermore, the doctors would testify at the plaintiff's trial concerning the extent and cause of her medical injuries. *Id*. The defendant sought to introduce evidence at trial of the relationship between the doctors and ML Healthcare Services (a medical funding company) "to show that Plaintiff's doctors were biased in their testimony and that Plaintiff's claimed medical expenses were unreasonable." *Id*.

As a starting point, **the district court "concluded that the business model used by ML Healthcare, which included the fronting of medical expenses for plaintiffs to the treating doctors that ML Healthcare had selected, was 'highly relevant and probative' as to the bias**

**of those doctors, as well as the reasonableness of the medical bills."** *Id*. at 1299. The trial court therefore allowed the defendant to introduce evidence at trial of the relationship between the doctors, ML Healthcare Services, and the plaintiffs ML Healthcare Services had referred to those doctors. *Id*. Following an eight-day trial, the jury returned a verdict for the defendant, and the plaintiff and ML Healthcare Services appealed, claiming the trial court erred in initially requiring them to produce evidence regarding their relationship, then allowing that evidence to be introduced at trial. *Id*. at 1296.

   **The defendant's theory of bias in *ML Healthcare Services* is identical to Defendants' theory of bias in this case**—that the agreements between a plaintiff, his or her lawyers, and the medical funding and factoring companies "creates the risk of bias on the part of doctors who receive referrals from [the funding and factoring companies] and who subsequently testify on behalf of the plaintiffs they have treated pursuant to those referrals." *Id*. at 1301. The risk of bias exists "because if a doctor did not provide a favorable causation analysis—which is necessary to win a tort action—[the funding and factoring companies] likely would find other doctors who would." *Id*. Therefore, "in order to continue to receive referrals from [the medical funding and factoring companies]—and the guaranteed income stream they generate—the treating doctors have an incentive to provide analyses that help these patients—and, by extension, [the medical funding and factoring companies]—win their case." *Id*.

   Finding that the trial court did not err in permitting evidence of the payment arrangement to be admitted at trial to show the testifying doctors' bias, the 11th Circuit held that:

- **"[T]he evidence was relevant," as "[i]ndeed, proof of bias will typically be relevant."** *Id*. at 1302 (citing *Abel*, 469 U.S. at 52 ("Proof of bias is almost always relevant because, the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of the witness' testimony.")).

- In order to probe potential bias, **the defendant "needed only to show that [the medical funding and factoring company's] payment arrangement had 'any tendency' to make bias more probable than it would be without the evidence,"** and finding that requirement "easily satisfied here." *Id*. (citing Fed. R. Evid. 401(a)).

- While the plaintiff argued that none of her doctors admitted to bias while testifying, the Court of Appeals noted that was "hardly a surprising revelation," and, in any event, "[a] witness's refusal to admit bias does not bar the opposing party from introducing evidence that might contradict such a protestation." *Id*.

- The trial court's determination that the probative value of the evidence of the agreements at issue outweighed any potential for prejudice to the plaintiff was not in error. *Id*. at 1303 (citing Fed. R. Evid. 403).

## B.   Dr. Hayes was unable or unwilling to provide responsive information during his individual deposition.

Elite's motion claims that a corporate representative deposition would constitute "the second deposition of the same witness on topics which could have been addressed during the first deposition."[2] Mot. at 4. This is wrong on several levels.

First, Dr. Hayes previously testified in his individual capacity, not as Elite's corporate representative. *See* Ex. 2, Hayes Dep. Second, Dr. Hayes repeatedly claimed ignorance of the topics at issue in the corporate representative deposition and deferred to others in his clinic—in particular, his practice manager, Caitlin McGroarty—on many of those topics.

> Q: …So this date down here, is that the date of payment?
>
> A: That's how I appreciate that. Again, I don't do billing…

*Id*. at 44:5-8.

> Q: Okay. And do you believe that Access Healthcare Management has made all these payments reflected on these – this billing invoice or billing summary?
>
> A: Again, I – I don't do billing. I don't have any reason to dispute that. But, yeah, I don't really know.

---

[2] Elite also argues that Halliburton "had the opportunity to request any medical records and billing records relevant to the medical treatment provided" to Plaintiff. Mot. at 2. As set forth in detail in Halliburton's Motion to Compel Compliance with Subpoena Directed to Non-Party Elite Medical Wellness, LLC, Elite has failed to produce documents and communications relevant to the true nature and scope of its ongoing financial relationship with Access and, by extension, A&I.

Q: And the one caveat I would – I would insert there would be that, you know, our firm made the payment for your video deposition, correct?

A: … Again, I – really, Mr. Flores, I don't do billing.

Q: Yeah. Who does do billing for you?

A: That would be Caitlin McGroarty, and I'm not sure who she delegates out additional billing actions. You – you'd have to ask her.

Q: And she's primarily in Lake Charles?

A: She's the overarching practice manager. So most of her physical time is in Lake Charles, but she does go to the Houston office as well.

Q: Okay. And Elite Medical Wellness would have the copies of the checks themselves, right, in its – in its billing file?

A: I have no idea.

Q: Okay. Would Caitlin be the person to ask that question to?

A: Correct. Yes, sir.

*Id*. at 51:4-52:8.

When asked about the contract in place between Elite and Access, Dr. Hayes responded as follows:

Q: Is this the agreement that is currently in effect between Elite Medical Wellness and Access Healthcare Management?

A: Presumably, it is. You know how contracts go. You don't rely on them or really mess with them until and unless something goes sour or needs some leverage. So Access sends us patients. We provide the services that we're requested to provide. Access pays for those services in a timely fashion. I just don't muck around with the contract a lot. I don't need to.

*Id*. At 128:3-13.

When asked about the retention of payment records, again, Dr. Hayes deferred to others at Elite:

Q: How long does your office retain payment records and checks and so on from individuals or entities paying for treatments?

A: I don't know. I would defer (sic) you to Ms. Rougeau or Ms. McGroarty…

*Id*. at 137:23-138:3.

Dr. Hayes also denied knowing how many of his patients were referred to Elite by Access and what percentage of his patients that represents. *Id*. at 142:7-9 ("I don't know how many of my patients are referred to me from Access Healthcare Management"); 143:9-17 ("Q:… what percentage of Elite Medical Wellness's patients are referred by Access Healthcare Management or some – other case management? A: Yeah. I don't know.")

In summary, had Dr. Hayes been willing and able to answer the pertinent questions posed to him during his individual deposition, perhaps a corporate representative deposition would not be necessary. Because he was unwilling or unable to do so, however, Halliburton must now seek that information through the 30(b)(6) process, which will require Elite to prepare a witness— whether Dr. Hayes or someone else—to provide the testimony he failed to provide during his individual deposition.

**C.    This Court has previously compelled documentary discovery from Elite relevant to issues similar to those that are present in this case.**

Next, Elite argues that the Court should deny Halliburton discovery because "the topics identified in the deposition notice ostensibly seek to elicit testimony concerning the protected health information pertaining to non-party patients which have treated with [Elite]" and "ostensibly seek to elicit testimony into [Elite's] and other third-parties' finances." Mot. at 3. This reference to "other third parties" is a reference to Access. Furthermore, Elite claims that preparing a corporate representative would impose an undue burden on Elite. *Id*. at 4.

First, "[t]he person filing the motion to quash bears the burden to demonstrate that compliance would impose an undue burden or expense." *Louisiana Corral Mgmt., LLC v. Axis Surplus Ins. Co.*, 650 F.Supp.3d 491, 499 (E.D. La. 2023). Elite's conclusory statements fail to meet its burden.

Second, Elite fails to mention that this Court previously compelled discovery involving Elite's "non-party patients" in another case that also involved a personal injury plaintiff also being treated by Dr. Hayes while also being represented by A&I.  *See* Ex. 14, Memorandum Order.

In the *Boutte* case, the defendants identified "37 individuals who were both A&I clients and patients of Respondent."  *Id*. at p. 1, n. 2.  To safeguard those individuals' protected health information, this Court ordered Elite to produce "appropriately redacted documents reflecting or describing the total amount of payments received by [Elite] from January 2019 through the present for medical services provided to the A&I Client/Patients." *Id*. at p.1. The Court defined "appropriately redacted" as "redacted of patient identifiers and protected health information to protect patient privacy."  *Id*. at n.1.  Of course, the subject of this motion is an oral deposition, which eliminates any burden on Elite associated with the redaction of patient records.

The Court also ordered Elite to produce documentary discovery on the following issues:

- "[A]ppropriately redacted invoices for the A&I Client/Patients who paid in cash or as self-pay from January 2019 through the present."

- "[A]ny document (including texts, emails, or other correspondence) reflective of any arrangement or agreement between [Elite] and A&I concerning what Respondent charges for its services."

- [A]ny appropriately redacted invoice from any Client/Patient referred by A&I, as identified in the list provided by Movant, from January 2019 to present."

- [A]ny communications with any employee or representative of A&I about this subpoena."

- "Any correspondence or communication of any kind with any attorney, agent, representative, or an individual or entity associated with a party in the above referenced lawsuit, regarding this discovery request, subpoena, any document or record related to or responsive to this discovery, this lawsuit, or plaintiff in this lawsuit, either individually, collectively, or generally."

*Id*. at p. 7-17.

In denying certain discovery requests in *Boutte*, the Court noted those requests did not "relate to the relationship between [Elite] and A&I or any bias on [Elite's] part. *Id*. at p. 10-12. Here, however, the topics set out in Halliburton's notice of deposition are entirely focused on the nature and scope of its relationship with Access and A&I and on the bias of Elite's providers (Dr. Hayes, in particular). Moreover, with the exception of Topic 10 (which is limited by subject matter to A&I clients), Halliburton has limited the corporate representative topics to matters relating to Plaintiff directly and/or to the limited time period of 4 years prior to Plaintiff's accident. *See* Ex. 13, Subpoena and Notice of Deposition.

In *Boutte*, as in this case, Elite sought to resist discovery.[3]  But, as it did in *Boutte*, this Court should order discovery relevant to the financial entanglements between Elite, Access, and A&I.

**D.    The Court should simply modify the subpoena's date for compliance.**

Finally, Elite argues that Halliburton's subpoena did not provide a sufficient time for compliance.  Mot. at 2.  As discussed above, Halliburton first served the deposition subpoena with corporate representative topics on Elite on January 24, 2025, one week before the intended deposition. *See* Ex. 12, Return of Service.  Halliburton served the subpoena again with a notice of deposition on January 27, 2025. *See* Ex. 13, Subpoena and Notice of Deposition.  The deposition was to take place in Lake Charles where Elite is located. *Id*.

In any event, the Court has the authority to modify, rather than quash, a subpoena.  Fed. R. Civ. P. 45.  And, "[m]odification of a subpoena is preferable to quashing it." *Louisiana Corral Mgmt., LLC*, 650 F.Supp.3d at 500; *see also e.g.*, *Rosales v. Lewis*, No. 1:22-CV-05838, 2024 WL

---

[3] Indeed, even after the Court's order compelling Elite to produce documents, Elite continued to resist such that the Movants were required to file multiple motions for sanctions and contempt and the Court was required to order Elite and Dr. Hayes to appear and show cause for why they should not be sanctioned for failing to comply with the Court's order. *See Boutte*, *infra*. (Docs. 28, 31, 36, 45).

3871045, at *2 (W.D. La. Aug. 19, 2024) ("Generally, modification of a subpoena is preferable to quashing it outright."). Accordingly, should the Court find the subpoena did not provide sufficient time for compliance, Halliburton would respectfully request that the Court modify the date of the deposition to a later date.

### IV. CONCLUSION AND PRAYER

Elite and Dr. Hayes have a vested interest in a favorable result for Plaintiff in this case. A&I refers personal injury plaintiffs to Access who then refers to them to Elite. The providers at Elite, including Dr. Hayes, then issue favorable diagnoses at inflated rates, and Access then purchases Elite's accounts receivable at a discount. Elite's providers, including Dr. Hayes, then testify favorably for plaintiffs at depositions and at trials on issues such as causation, necessity of treatment, and the reasonableness of charges. They do so to secure a continued stream of personal injury plaintiffs as clients from A&I through Access. A&I then presents Plaintiff's inflated medical costs as part of its damages number and settles up with Access at some lower amount after a judgment or settlement.

The discovery Halliburton seeks is relevant to the bias of Elite's providers, including Dr. Hayes, who will be testifying at trial, and to the reasonable value of the medical services Elite provided. For these reasons, Halliburton Energy Services, Inc., defendant in the underlying suit and respondent herein, respectfully requests that the Court deny Elite Medical Wellness, LLC's motion for protection and order Elite Medical Wellness to present a corporate representative for deposition within 30 days of the Court's Order.

Dated: February 21, 2025

Respectfully submitted,

**MAHTOOK & LAFLEUR**
(A Professional Law Corporation)

BY:   /s/ Richard J. Hymel
RICHARD J. HYMEL (#20230)
      Post Office Box 3089
      600 Jefferson Street, Ste. 1000
      Lafayette, LA 70501
      Telephone: (337) 266-2189
      Telefax:    (337) 266-2303
      rhymel@mandllaw.com

**Counsel for HALLIBURTON ENERGY SERVICES, INC.**

*OF COUNSEL*

**AHMAD, ZAVITSANOS & MENSING, PLLC**

Joseph Y. Ahmad
Texas State Bar No. 00941100
*\* Pro hac vice application forthcoming*
joeahmad@azalaw.com
Rey Flores
Texas State Bar No. 24068777
*\* Pro hac vice application forthcoming*
rflores@azalaw.com
Kevin Leyendecker
Texas State Bar No. 00784472
*\* Pro hac vice application forthcoming*
kleyendecker@azalaw.com
Sammy Ford
Texas State Bar No. 24061331
*\* Pro hac vice application forthcoming*
sford@azalaw.com
1221 McKinney, Suite 2500
Houston, Texas 77010
Telephone: 713-665-1101
Facsimile: 713-655-0062

18

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on February 21, 2025, a true and correct copy of the foregoing document was served on all counsel of record by electronic service.

*/s/ Richard Hymel*
Richard Hymel